August 19, 2015

# COMMONWEALTH OF MASSACHUSETTS

## *Division of Administrative Law Appeals*

## Bureau of Special Education Appeals

---

# DECISION

# BSEA #1505285

---

**BEFORE**

**AMY REICHBACH**
**HEARING OFFICER**

**JEFFREY SANKEY, ATTORNEY FOR STUDENT**

**PETER SMITH, ATTORNEY FOR SCHOOL**

# COMMONWEALTH OF MASSACHUSETTS
## DIVISION OF ADMINISTRATIVE LAW APPEALS
## BUREAU OF SPECIAL EDUCATION APPEALS

In re:  Lauren[1]                                                    BSEA #1505285

## DECISION

     This decision is issued pursuant to the Individuals with Disabilities Education Act (20 USC 1400 *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 USC 794), the state special education law (MGL c. 71B), the state Administrative Procedure Act (MGL c. 30A), and the regulations promulgated under these statutes.

     A hearing was held on June 23, 25, 29, and 30, 2015 before Hearing Officer Amy Reichbach. Those present for all or part of the proceedings were:

| | |
|---|---|
| Student's Mother | |
| Judith Bono | Speech and Language Pathologist, Hampden-Wilbraham Regional School District |
| Sherrill Caruana | Principal, Stony Hill School, Hampden-Wilbraham Regional School District |
| Deborah Gelinas | Special Educator, Hampden-Wilbraham Regional School District |
| Pamela Haywood | Educational Team Leader, Hampden-Wilbraham Regional School District |
| Kira Henninger | Psychologist, Hampden-Wilbraham Regional School District |
| Terrie Henrich | Special Educator, Hampden-Wilbraham Regional School District |
| Dr. Debra Tobias | Special Education Director, Hampden-Wilbraham Regional School District |
| Rebecca Young | Teacher, Hampden-Wilbraham Regional School District |
| Linda Lafontaine | Principal, Curtis Blake Day School |
| Dr. Joanna Miles | Ed.D, Independent Evaluator (by telephone) |
| Alicia Ziegler | Speech and Language Pathologist, AEZ Reading |
| Peter Smith, Esq. | Attorney for Hampden-Wilbraham Regional School District |
| Jeffrey Sankey, Esq. | Attorney for Parents |
| Sean A. Feener | BSEA Intern |

The official record of the hearing consists of documents submitted by the Hampden-Wilbraham Regional School District and marked as Exhibits S-1 to S-46; documents submitted by the Parents and marked as Exhibits P-1 to P-34;[2] and approximately four days of recorded oral testimony and argument. As agreed by the parties, written closing arguments were due and received on July 10, 2015. The record closed on that date.

---

[1] "Lauren" is a pseudonym chosen by the Hearing Officer to protect the privacy of the Student in documents available to the public.

[2] Parents withdrew from the record their Exhibit 8, an Individualized Education Program (IEP) dated 12/16/14-12/15/15, stating that this exhibit was incomplete. Parents instead relied on School Exhibit 18 as the more accurate representation of the IEP for this period.

INTRODUCTION

At issue in this case are: 1) whether the educational services provided for Lauren by the Hampden-Wilbraham Regional School District (hereinafter "the District" or "Hampden-Wilbraham") from May 20, 2014 to the present constituted a free appropriate public education ("FAPE"); and 2) whether the program it proposes for the 2015-2016 school year provides Lauren with FAPE. For the reasons discussed below, I find that the District did not provide Lauren with FAPE. The District's proposed placement of Lauren in a full or partial inclusion program with multiple pull-outs for the spring semester of the 2014-2015 school year failed to provide Lauren with appropriate programming designed to allow her to make meaningful educational progress. I find further that the Focus Program the District has proposed for the 2015-2016 may be an appropriate placement (or can be made appropriate) for Lauren.

ISSUES

1. Whether the IEPs and amendments thereto developed by Hampden-Wilbraham Regional School District from May 20, 2014 to the present and in effect at the time of Parents' unilateral placement of Lauren at Curtis Blake Day School ("Curtis Blake") in December 2014 were and/or are reasonably calculated to provide a free appropriate public education to Lauren in the least restrictive environment;

2. If not, whether placement at Curtis Blake was appropriate for Lauren, thus entitling Parents to reimbursement for their unilateral placement through the end of the 2014-2015 school year; and

3. Whether the program proposed by the District for the 2015-2016 school year is an appropriate placement for Lauren, and if not, whether this program could be made appropriate.

FINDINGS OF FACT

A.   Early History, Evaluations and IEPs Before Placement at Stony Hill

1. Lauren is an eight year old girl who has just completed the second grade. She is described by her parents and her teachers as energetic, bright, expressive, and outgoing. (S-2; Mother). Lauren carries a number of diagnoses, including attention deficit hyperactivity disorder (ADHD), dyslexia, and a Specific Learning Disability in Reading. (P-11; P-16; S-18) Lauren's family history is significant for both ADHD and dyslexia. (Mother)

2. Lauren's mother has always been a strong advocate for Lauren and for her other two children who attend public schools within Hampden-Wilbraham, essentially a "partner at the table . . . respectful of what the school was trying to do and what her child's needs are." (Caruana)

3. Lauren's mother first had concerns about Lauren's hyperactivity in early 2012, when she was four years old. (Mother) She sought a private neurodevelopmental evaluation, which was conducted by developmental pediatrician Dr. Dennis Rosen. (P-11; Mother) Dr. Rosen diagnosed Lauren with a developmental delay associated with ADHD, developmental language and motor output inefficiencies, and adjustment problems with sleep dysfunction.[3] (P-11) He prescribed medication for Lauren's attention deficits, which she continues to take consistently today. (Mother)

4. Lauren's mother also referred Lauren to the District for evaluation in March 2012. At this time, her primary concern was Lauren's inattention. (Mother) The District arranged for evaluations to be conducted by its Occupational Therapist, Speech and Language Pathologist, and psychologist. Occupational therapy results demonstrated that Lauren was functioning at age level and that her sensory needs were not preventing her from accessing the preschool curriculum.[4] (S-3; S-34) Speech and language testing indicated weaknesses in Lauren's receptive language and word retrieval, with overall language skills within expected limits for her age.[5] (S-35; S-42) Psychoeducational testing yielded below average verbal comprehension, perceptual reasoning, and overall cognitive ability.[6] (S-36)

5. These evaluations were discussed at a Team meeting on March 20, 2012, when Lauren was enrolled at Green Valley, a private preschool in Hampden, Massachusetts. (S-5; Mother) The Team found Lauren eligible for special education services under a diagnosis of developmental delay. (S-2) Lauren's first IEP, dated 3/20/2012-3/19/2013, enumerated specific concerns that included her difficulty with word retrieval and receptive language skills. (P-3) It aimed to address these concerns through an inclusion placement with direct services through pull-outs ("C-grid services") in speech and language (once a week for thirty minutes) and academic skills (five times a week for thirty minutes each time), as well as direct services in the general education classroom ("B-grid services") in speech and language (once a week for thirty minutes) and academic skills delivered by the early childhood specialist daily for 354 minutes. The District proposed that Lauren receive these servies through a placement in an "integrated language based" early childhood program at Mile Tree Elementary School ("Mile Tree"), which, according to the District, utilized "multi-sensory materials and activities presented individually and in small and large groups." (S-3, Tobias)  Concerned primarily about class size,[7] Lauren's parents

---

[3] Dr. Rosen also recommended further school evaluations in the areas of occupational therapy, speech and language, and cognitive skills.

[4] Hampden-Wilbraham Regional School District ("Hampden-Wilbraham" or "District") Occupational Therapist Allison Spanos-Gearing administered the Beery Visual Motor Integration Test. (S-34)

[5] Hampden-Wilbraham Speech and Language Pathologist Kara Gelinas administered the Peabody Picture Vocabulary Test-III, Expressive Vocabulary Test, and the Clinical Evaluation of Language Fundamentals-Preschool-2. (S-35)

[6] Hampden-Wilbraham Psychologist Kira Henninger administered the Wechsler Preschool and Primary Scale of Intelligence (WPPSI-III); Bracken School Readiness Assessment (Third); Conner's Parent Rating Scale Revised; and Conner's Teacher Rating Scale Revised. (S-36)

[7] In her testimony Lauren's mother referenced a classroom size of twenty-six, but Dr. Debra Tobias, Hampden-Wilbraham's Director of Special Education, testified that the maximum class size in Mile Tree Elementary School's early childhood program was 15. (Tobias)  Lauren's mother clarified upon further questioning that the preschool

rejected early childhood services and placement at Mile Tree, but accepted all others to begin when Lauren entered kindergarten.[8] (P-3)

6. During the summer of 2012, Lauren was referred by her parents for a psychological evaluation and a speech and language evaluation at Learning Solutions for Learning Success in Florence, Massachusetts. Lauren was diagnosed with ADHD, mixed receptive and expressive language disorder, a reading disorder, and disorder of written expression; evaluators also noted that Lauren was at risk for dyslexia.[9] (P-12)

On the Stanford Binet Intelligence Scales-Fifth Edition, Lauren received below average composite scores in fluid reasoning, knowledge, and visual-spatial processing, in the 5th, 13th, and 6th percentiles, respectively. Qualitative reasoning and working memory composites were in the average range.[10] The evaluator conducting psychological and neuropsychological testing described Lauren's behavior as impulsive, inattentive, and disorganized. Consequently, she questioned the validity of Lauren's scores, particularly in the area of cognitive testing. The evaluator noted that at the time of testing, Lauren experienced no detriment to her self-esteem as a result of her disabilities, but that this could change in the future. (P-12)

The evaluator who conducted speech and language testing observed that Lauren "demonstrated severely impaired receptive language abilities across all testing." Lauren performed severely below average on a screening measure designed to assess her receptive language skills.[11] She scored in the high average range on a test of her receptive vocabulary, but in the low average range on a test of her expressive vocabulary, a difference the evaluator flagged as significant. Her scores on the Illinois Test of Psycholinguistic Ability (ITPA-3) indicated difficulties with phonological awareness, and the evaluator expressed concern regarding Lauren's "severely below average" performance on the Test of Narrative Language. (P-12)

Recommendations included speech and language therapy to focus on receptive language, language formulation, and phonological processing. The Learning Solutions evaluators also recommended that Lauren undergo an occupational therapy assessment. (P-12)

7. After notifying the District that Lauren would not be attending Mile Tree during the 2012-2013 school year,[12] Lauren's parents enrolled her in kindergarten at The Grammar

---

classroom she observed was separated into two sides, each with fifteen children and their teachers, and that it was an "extremely busy . . . very active setting." (Mother)

[8] Lauren's mother testified that Lauren did in fact receive speech services through Hampden-Wilbraham for a period of time in 2012. (Mother)

[9] The Learning Solutions for Learning Success evaluation was signed by three individuals: Shari Katz, Ph.D., Sarah Boretz, M.S., CCC-SLP, and Margaret Miller, Ed.D. (P-12)

[10] On the Wide Range Assessment of Memory and Learning (WRAML-2), Lauren's scores were in the average range on measures of verbal memory. She demonstrated below average abilities in copying analytical designs and in visual sequential memory. (P-12)

[11] Receptive language skills were assessed utilizing the Toker Test for Children – Second Edition (TTFC-2). (P-12)

[12] Lauren's mother testified that she decided against placing Lauren at Mile Tree for kindergarten due to her concerns about class size and the services offered by the District. She acknowledged that The Grammar School is not a special education school and estified that she believed the average class size there was between ten and twelve

4

School in Somers, Connecticut [13] (S-4; Mother) In kindergarten at The Grammar School, Lauren received speech and language services once a week for thirty minutes under a non-public service plan. This plan was dated October 15, 2012 and developed through the Somers, Connecticut Public Schools.[14] (P-1)

8.  Lauren's Team in Hampden-Wilbraham met on March 21, 2013 to consider Lauren's Learning Solutions evaluation. The IEP developed following this meeting, dated 3/21/2013-3/20/2014, includes these results as well as a statement from Lauren's kindergarten teacher at The Grammar School about Lauren's learning style and her progress.[15] (P-4)

The District proposed a placement at Mile Tree for the 2013-2014 school year, with direct services in the general education classroom in mathematics (five times a week for thirty minutes each time) and written expression (also five times a week for thirty minutes each), and direct services outside the classroom in speech and language (once a week for thirty minutes) to be delivered by speech staff, and academic skills (five times a week for thirty minutes each) and reading/decoding (five times a week for forty-five minutes each) to be delivered by a special education teacher. (P-4) This placement, which the District classified as "full-inclusion," involved eleven "pull-outs" from the classroom each week.

Parents accepted this IEP but declined services; they notified the District that Lauren would attend The Grammar School for first grade during the 2013-2014 school year. (P-4)

9.  Lauren attended first grade at The Grammar School during the 2013-2014 school year. She did not receive speech and language services in first grade, as her Somers Academy/Somers, Connecticut planning and placement team had determined that Lauren did not meet the disability standard.[16] Recognizing that she still had some relative weaknesses, Somers Academy agreed to continue to provide her with individual accommodations. (P-2) Lauren's parents arranged for her to receive privately-funded

---

students. (Mother) The District argues that Parents' decision to place Lauren at The Grammar School and their failure to access the services offered by the District during Lauren's kindergarten and first grade years worsened her condition. Although this may be true, it has no bearing on the determination this Hearing Officer must make as to the appropriateness of the IEPs proposed by the District for Lauren from May 2014 to the present.

[13] For the purposes of the record, "The Grammar School" is used interchangeably with "Somers Academy;" both refer to the school Lauren attended for kindergarten and first grade in Somers, Connecticut.

[14] Although the Grammar School worked with the Somers, Connecticut Public Schools to develop a service plan for Lauren, as a private school it was not bound by special education laws to do so. According to Dr. Tobias, Hampden-Wilbraham did not receive copies of Lauren's Somers, Connecticut planning and placement team or speech and language pathology reports contemporaneously, and in fact was not aware of the existence of these documents until they appeared in Parents' Exhibit book.

[15] Lauren's kindergarten teacher, Leah Weaver, described Lauren as a "kinesthetic learner" who participated in whole group, small group, and one-on-one instruction. She stated that Lauren was working on developing an understanding of individual letter sounds, with teacher guidance, and that she had working knowledge of a few sight words. (P-4)

[16] This determination was made at a meeting held on May 28, 2013 during which the planning and placement team reviewed Lauren's performance and an assessment conducted by Somers' Speech Pathologist.

tutoring services five hours per week designed to address her attention, reading and math skills. They also arranged and paid for Lauren to receive after-school tutoring with her first grade teacher. (Mother)

10. Lauren's Team at Hampden-Wilbraham met on March 14, 2014 to consider Lauren's services for her second grade year. The Team received input from Lauren's first grade teacher at The Grammar School, who reported that Lauren had excellent oral communication skills and could clearly express her thoughts, but that she worked best given one-to-one assistance and required encouragement to work independently. Ms. Hinkamper further reported that Lauren had 25 sight words from the Fry first-100 list and was reading at guided reading level E. With regard to Lauren's math skills, Ms. Hinkamper noted that Lauren demonstrated an understanding of patterns, sequencing, and recognition of numbers, often using manipulatives to help her visualize math problems. (P-5)

The IEP generated from this meeting, dated 3/14/2014-3/13/2015, retained the B-Grid services of the prior IEP (mathematics five times a week for thirty minutes each and written expression five times a week for thirty minutes each) and the pull-out in reading/decoding (five times a week for forty-five minutes each), but eliminated the other C-grid services (academic skills and speech and language). Parents again accepted the IEP as written, but declined services because Lauren was enrolled at The Grammar School. (P-5)

11. On April 22, 2014, while Lauren was in the first grade at The Grammar School, Dr. Joanna Miles conducted a psychoeducational evaluation at the request of Lauren's parents. (P-16; Miles) Dr. Miles has a Master's degree in clinical psychology and an Ed.D. in Educational Psychology. She is certified in Massachusetts as an Administrator of Special Education, a Pupil/Personnel Director, a School Psychologist, and an Educational Psychologist. After completing her doctorate, Dr. Miles worked as a school psychologist for over six years, administering psychoeducational evaluations to students in grades PreK-12. She then worked for three years as Holyoke Public Schools' Assistant Director for Special Education, which entailed reviewing IEPs for compliance, facilitating the IEP process, and evaluating special educators. She thereafter became Holyoke Public Schools' School Psychologist Department Head/Therapeutic Intervention Program Psychologist in 2011. In this capacity, among other responsibilities Dr. Miles participates in observations and student evaluations; she also assists in managing the school's therapeutic intervention programs for students with emotional disabilities. (P-17; Miles)

Since 2005, Dr. Miles has also maintained a private practice through which she conducts independent evaluations of students in grades PreK-12 and provides consultations to their parents and school districts regarding their cognitive and social/emotional needs. Throughout her career, Dr. Miles has conducted well over a thousand psychoeducational evaluations, and has consulted both for students and for school districts regarding children's cognitive, academic, and social/emotional needs. (P-17; Miles)

12. Dr. Miles evaluated Lauren in her home. Lauren was willing to attempt all tasks presented to her and was able to verbalize which tasks she could not complete. Lauren was observed to be impulsive in her responses and required much prompting to remain on task. In the course of her evaluation, Dr. Miles examined Lauren's past evaluations conducted by Dr. Rosen and Learning Solutions, Lauren's then-current IEP, and a March 2014 statement from Lauren's first grade teacher.[17] Dr. Miles also reviewed the psychoeducational assessment performed by Hampden-Wilbraham in March of 2012 but did not refer to this document in her report. (P-16; S-36; Miles)

Dr. Miles administered the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV). Lauren scored within the average range for verbal comprehension (61st percentile) and perceptual reasoning (25th percentile).[18] Lauren's working memory and processing speed scores were in the borderline range, at the 6th and 5th percentiles, respectively. Lauren's full-scale IQ at the time of testing was 86, which is in the average range.[19] Dr. Miles cautioned that even though Lauren's overall functioning fell within the low average range, it is important to interpret each index separately when there is a significant discrepancy between the scores. (P-16) Based on these results, Dr. Miles described Lauren as a student with average abilities who has difficulties with working memory and processing speed that are impeding her ability to learn to read.[20] (Miles) Dr. Miles concluded that Lauren has the cognitive capacity to learn, but that she has significant areas of weakness and her difficulties are substantial. (P-16; Miles)

Dr. Miles also administered the Woodcock-Johnson Test of Achievement, Third Edition. Lauren scored in the 4th percentile in reading fluency, the 5th percentile in spelling, and the 8th percentile in writing samples. Her overall academic skills placed her in the low range for achievement (5th percentile), and her ability to apply those skills was also within the low range. (P-16) Dr. Miles testified that these scores reflect a child who is "really struggling with reading" and who is performing much lower in these areas than would be expected given her cognitive abilities. Lauren's higher scores in oral language, story recall, and understanding directions indicate that her chief issue is processing written text; when the information is presented orally, Lauren's performance is more consistent with her cognitive skills. This profile, according to Dr. Miles, is "quite typical for students with reading disabilities." (P-16; Miles)

Finally, Dr. Miles administered the Comprehensive Test of Phonological Processing, Second Edition (CTOPP-2), which examines an individual's awareness of and access to speech, sounds and words. On this test, Lauren's scores placed her in the 3rd percentile (within the poor range) for phonological awareness, the 75th percentile for phonological memory, and the 21st percentile for rapid naming. According to Dr. Miles, these results

[17] This statement is described in Finding 10, *supra*.
[18] According to Dr. Miles, verbal comprehension is a reflection of a student's ability to read with words, her ability to compare and contrast, and her proficiency with vocabulary; perceptual reasoning is a "very visual" test that measures a child's ability to read without supports, using blocks, pictures, and puzzles. (Miles)
[19] Dr. Miles noted in her report that Lauren's "unique set of thinking and reasoning abilities make her overall intellectual functioning difficult to summarize by a single score on the WISC-IV." (P-16)
[20] Dr. Miles also testified that, given Lauren's profile, she would hope that Lauren's reading level would progress at a rate of one year of growth per academic year with "intensive instruction." (Miles)

"indicate that [Lauren] demonstrates a significant weakness in her awareness of, and ability to manipulate the speech sounds in words." Although her coding of phonological information in working or short-term memory is a strength, her ability to efficiently retrieve phonological information from long-term memory is below average. (P-16) Dr. Miles reported that Lauren's disability requires her to expend so much energy simply trying to decode words that she is "mentally exhausted" before she is able to make sense of the information. (Miles)

As a result of her testing, Dr. Miles diagnosed Lauren with a specific learning disability in the area of reading and recommended a "more direct, explicit, structured language program that is taught in a sequential, systematic, repetitive manner [and] implemented programmatically[,] built into her school day, across all academic subjects," to allow for practice, reinforcement, and scaffolding throughout the day. (P-16) In her report Dr. Miles noted that several research-based programs could be utilized to deliver this kind of instruction in a multisensory manner. In her testimony at hearing, Dr. Miles clarified that although she did not use the words "substantially separate" or "language-based" in her report, she had described a program comprised of these elements and she continues to believe that Lauren requires a substantially separate language-based program to help her "gain all of the skills that she's lacking."[21] Dr. Miles also testified that Lauren would benefit from having opportunities for inclusion with typical peers built in to her program, increasing as Lauren's skills develop.[22] (P-16; Miles)

13. The results of Dr. Miles's evaluation were shared with the District and a Team meeting was held in May 2014 to discuss these results, Lauren's progress, and her continued eligibility for special education services.

This was the first of Lauren's Team meetings attended by Pamela Haywood, an Educational Team Leader (ETL) in the Hampden-Wilbraham Regional School District. Ms. Haywood holds a Master's degree in Social Work, a Certificate of Advanced Graduate Studies (CAGS) in Special Education Administration, professional licenses as an independent clinical social worker and a School Adjustment Counselor, and an initial license as a Special Education Administrator. (S-43) In 2006, Ms. Haywood began working for the District as a school adjustment counselor; she served in this capacity until 2009, when she became an ETL. Before she joined the District, Ms. Haywood was a social worker and therapist in various capacities for over 16 years. Her responsibilities as an ETL include chairing Team meetings, developing and implementing IEPs, and working with teachers and principals to ensure that IEPs are being implemented. Ms. Haywood testified that the Team considered Dr. Miles' psychoeducational evaluation and information (including progress updates and AIMSweb data) from Somers Academy in finding Lauren eligible for special education due to a specific learning disability in reading. (Haywood)

---

[21] Dr. Miles explained that her practice is to describe what she believes a student needs and leave the decision regarding specific programming to a student's Team. (P-16; Miles)
[22] Dr. Miles testified that it is important that Lauren's reading difficulties be remediated now, before she reaches grades three and four, when students make the switch from learning to read, to reading to learn, and that when she makes sufficient progress "she can come back to the inclusion world." (Miles)

At this meeting, the Team generated a new IEP, dated 05/20/2014-05/19/2015. (S-12) This IEP retained the B-Grid services of the last IEP [mathematics (5x30) and written expression (5x30)] as well as the C-Grid services in reading/decoding (5x45). Neither academic skills nor speech and language services were restored to the C-Grid.

Parents accepted this IEP in full but rejected the District's failure to provide Lauren with a full language-based program to address her needs, as recommended by Dr. Miles. Parents agreed to placement at Stony Hill Elementary School ("Stony Hill School" or "Stony Hill") in the District beginning in the 2014-2015 school year, when Lauren entered second grade. At this time, as a result of her concerns with the District's proposed services and in the absence of new services proposed to address the information and recommendations generated by Dr. Miles, Lauren's mother contacted the Curtis Blake Day School. (P-12; Mother)

B.   Lauren at Stony Hill; Parents' Decision to Place Her Unilaterally

14. Lauren transitioned to Stony Hill at the beginning of second grade and began receiving services in a full-inclusion program under the 05/20/2014- 05/19/2015 IEP. (P-6; Mother) Her class consisted of first 24, and later 23, students. (Caruana)

Pursuant to this IEP Lauren received inclusion reading instruction and small group reading instruction in the general education setting with her classroom teacher, Rebecca Young. Ms. Young holds a Master's degree in Education and a CAGS in Education with a Concentration in Literacy. She is licensed by the Department of Elementary and Secondary Education (DESE) in Elementary Education and Reading and has been employed as a teacher in the District since 2001. (S-22; S-43)

Lauren received pull-out reading and phonics instruction from Deborah Gelinas, a special education teacher at the Stony Hill School. Ms. Gelinas was also present in Lauren's general education classroom, where she provided inclusion writing support. Ms. Gelinas holds a Master's degree in Education and DESE licenses in Elementary Education (K-8) and Special Education (moderate disabilities, PreK-8). She has completed Lindamood-Bell training in evidence-based programs such as Visualization and Verbalization and Seeing Stars, as well as training in LiPS (Lindamood Phoneme Sequencing program) from the Commonwealth Learning Center. Ms. Gelinas has also completed a professional development course in Phono-Grafix, a reading decoding program. She has worked in the District since 2001. (S-43)

Stony Hill's approach to reading was described in detail at the hearing by Principal Sherril Caruana. Ms. Caruana holds two Master's degrees in Education, one focused on learning disabilities and the other, operational management. She taught both general and special education students for approximately nine years before joining the District in 1992 as a laboratory science specialist. She became head teacher at an elementary school in Wilbraham in 2004 and principal at Stony Hill in 2007. Ms. Caruana is currently certified by the DESE as a Principal/Assistant Principal for grades 1-6. She was

previously licensed to teach grades 1 through 6 general education and preK-8 special education (moderate special needs). (S-43; Caruana)

Hampden-Wilbraham Director of Special Education and Student Services Debra Tobias testified at the hearing about the District's special education programming more generally. Dr. Tobias reviewed Lauren's case annually when she was placed outside the District, chaired Lauren's Team meeting on December 16, 2014, and attended a resolution meeting on April 13, 2015. Dr. Tobias holds a Master's degree in Education (Curriculum Development and Special Education Administration) and an Ed.D. in Instructional Leadership and Administration. (S-43) Dr. Tobias also holds professional licensure from the Commonwealth in the following areas, among others: Administrator of Special Education (all levels), Principal/Assistant Principal (PreK-9), Elementary Teacher (K-8), and Special Needs (K-9). Dr. Tobias has worked in special education administration for almost 18 years, serving as director of special education for the Hampden School District before becoming special education coordinator for the District following its regionalization as Hampden-Wilbraham. She has served the District in her current capacity since 2008. Her job requires that she meet with educational team leaders, ensure compliance with IEPs, attend team meetings, and monitor "critical cases" within the District. In her time with the District, Dr. Tobias has reviewed over 12,000 IEPS, read thousands of assessments, and attended over a thousand Team meetings. (S-43; Tobias)

15. According to Ms. Caruana, Stony Hill utilizes the "five pillars of reading" (phonemic awareness, phonics, oral reading fluency, vocabulary, and comprehension) in an "integrated fashion" to teach students how to become successful readers. When a student is struggling, educators use that student's screenings from kindergarten on to build an individual reading program based on her needs within the various components of the "five pillars." Ms. Caruana testified that screening information was available for Lauren only from September 2014, the beginning of her second grade year, because she was enrolled at The Grammar School before that time, and that the District did not have any "early onset rhyme or sound correlation" evaluations because Lauren was not enrolled at Mile Tree when the tests would have been administered.[23] (Caruana)

Ms. Caruana reported that during the fall of 2014 she was "seeing growth" in Lauren in both the general and special education settings, particularly with regard to sight words. Lauren's mother testified that during this same time period, Lauren's self-esteem began to suffer as she came to recognize that she was not keeping up with her peers at Stony Hill, and other students began making comments which "made her feel stupid," such as suggesting that she was reading "baby books." (Mother; Caruana) Lauren's mother also reported that Lauren cried every day before and after school, and expressed frustration with the pull-out services provided her by the District.

---

[23] The District did, however, have Kara Gelinas' March 2012 speech and language testing (S-35) and the results of a speech and language evaluation from Learning Solutions (P-12), which were conducted contemporaneously with the screenings that Ms. Caruana testified Lauren would have received at Mile Tree. Later that fall, the District also received the results of a language and literacy evaluation conducted by Alicia Ziegler. (P-21) Despite the fact that it did not have the opportunity to administer its in-house screenings, the District had ample information regarding Lauren's speech and language skills.

Although she did not provide pull-out services for Lauren during her time at Stony Hill, Hampden-Wilbraham special educator Terrie Henrich, who provides pull-outs for other District students, testified that generally pull-out services in the District are "seamless;" individual students are pulled from classes "when there's a good segue," not when they are in the middle of other activities. According to Ms. Henrich, schedules are carefully and collaboratively planned at the beginning of the school year by a student's service providers, including classroom teachers and special educators. Ms. Henrich also testified that there is no stigma attached to students leaving for pull-out services because many students require many different services in the public school setting. (Henrich)

16. Due to their continuing concerns about Lauren's language, reading, and written language skills and their impact on her self-esteem[24] and overall learning at school, combined with the District's failure to restore speech therapy services for Lauren and the lack of significant changes to Lauren's program to address adequately her newly-diagnosed underlying language-based learning disorder, Lauren's parents sought a private speech and language evaluation.[25] Alicia Ziegler conducted that on September 24, 2014, while Lauren was in the second grade at Stony Hill. In addition, Ms. Ziegler observed Lauren on October 22 and 29, 2014 at Stony Hill[26] and again on April 8, 2015, at Curtis Blake. (P-18, Mother)

Ms. Ziegler has a Master's degree in Hearing, Speech, and Language Sciences and is a certified member of the American Speech-Language and Hearing Association.[27] She is licensed by DESE as both a speech and language pathologist and an educator. Ms. Ziegler has earned both initial and advanced Orton-Gillingham reading certification and meets the International Dyslexia Association's criteria for professionals who can diagnose dyslexia. For over a decade she has provided diagnostic and therapeutic services to children of various ages as a certified speech and language pathologist in both clinical and scholastic settings. Ms. Ziegler currently supervises teachers seeking Orton-

---

[24] According to her mother, by this point Lauren had become aware of her difficulties and had been upset on several occasions that she could not read as well as her peers, causing her mother to worry about her declining self-esteem. (P-18, Mother)

[25] Lauren's mother testified that one of her other children has dyslexia. At this point Lauren had not received that diagnosis, but her mother believed that additional information through testing could shed some light on Lauren's ongoing difficulties. (Mother)

[26] At the hearing, Dr. Tobias testified about the agreement signed by Ms. Ziegler at the time of her first observation at Stony Hill, which stated, "I further agree that the observation of the child is in no way an evaluation of staff performance." According to Dr. Tobias, Ms. Ziegler's report of her observation violated that agreement in that it contained multiple statements regarding "how our teacher was teaching." After cross-examination, it was not clear whether Ms. Ziegler has signed a form that was meant for volunteers only (rather than observers) and/or for parents, but in any event Dr. Tobias testified that should any comments about teachers' performance (including whether they are employing the proper methodology) made by observers in their reports regarding the appropriateness of a child's program be shared beyond consultation with a parent, this would violate district policy. (Tobias) In their written closing brief, Parents asked that I find specifically that this practice is improper. Given that the question is not directly before me and its resolution is not required to decide this case, I decline their invitation to do so.

[27] Ms. Ziegler's *curriculum vitae*, entered into evidence as P-21, lists her graduate degree as a Master's of Arts in Hearing, Speech, and Language Sciences. At hearing, Ms. Ziegler testified that she has a Master's degree in Speech and Language Pathology. I do not believe that the discrepancy bears on Ms. Ziegler's credibility; I merely note it here for the purposes of accuracy. (P-21; Ziegler)

11

Gillingham Level One Certification; teaches American Sign Language as an adjunct professor; and maintains a private practice through which she provides independent evaluations for students in the areas of speech and language development, articulation, and reading and writing. (P-21, Ziegler)

Ms. Ziegler's testing included the Clinical Evaluation of Language Fundamentals-Fifth Edition (CELF-5), the Peabody Picture Vocabulary Test-Fourth Edition (PPVT-4), the Gray Oral Reading Test-Fifth Edition (GORT-5), the Test of Word Reading Efficiency (TOWRE), the Test of Written Spelling-Fourth Edition, and the Gallistel-Ellis Test of Coding Skills. As part of this evaluation, Ms. Ziegler reviewed Lauren's previous speech and language evaluation completed through Hampden-Wilbraham, her then-current IEP, and the psychoeducational assessment conducted by Dr. Miles.

On the CELF-5, Lauren received a core language score in the low average range (85); a receptive language score moderately below average (76); and an expressive language score in the low average range (87). She also exhibited difficulty following directions consisting of more than two steps, which is reflective of receptive language issues. (P-18; Ziegler)

Hampden-Wilbraham speech and language pathologist Judith Bono, whose qualifications are discussed in Finding 20, *infra*, testified that Ms. Ziegler misstated the average range on the CELF-5 in her report as 85-115; according to Ms. Bono, the average range is 86-114. (P-18; Bono) The difference, however, is operative only with regard to Lauren's core language score, which would move from the average range to below average. (P-18; Bono) Ms. Bono also testified that the Clinical Evaluation of Language Fundamentals-manual does not differentiate between high and low averages as Ms. Ziegler did in her interpretation of Lauren's scores. (Bono)

On the PPVT-4, which examines a student's ability to understand single vocabulary words in isolation, with no reading or writing involved, Lauren scored in the average range (37th percentile) as compared to same-age peers, which suggests that her vocabulary knowledge should have a positive impact on her reading and listening comprehension skills. On the GORT-5. Lauren performed significantly below average in reading rate (1st percentile), reading accuracy (2nd percentile), reading fluency (1st percentile), and reading comprehension (1st percentile), as well as significantly below average in reading ability overall (1st percentile). (P-18; Ziegler)

On the TOWRE, Lauren's sight word reading efficiency was moderately below average (3rd percentile), and her phonemic decoding efficiency was significantly below average (1st percentile). She scored significantly below average (1st percentile) on the Test of Written Spelling and was unable to spell any of the target words. For example, when asked to spell the word "yes" she answered "f-y-s," and for "she" Lauren spelled "h-e-d." She was also unable to write her last name or the entire alphabet. On the Gallistel-Ellis

Test of Coding Skills,[28] Ms. Ziegler reported that Lauren had "significant difficulty" with all but one-syllable and irregular words, which require memorization rather than phonetic proficiency. She noted that Lauren performed poorly in both reading and spelling, and that her overall performance indicated a "significant need for structured and sequential instruction in phonics, coding, and decoding...." (P-18)

Based on these results, Ms. Ziegler diagnosed Lauren with a moderate receptive language disorder characterized by difficulty processing and comprehending language at both the sentence and paragraph levels. Noting her deficits in reading comprehension, sight word reading, decoding words with more than one syllable, written language, spelling, and language-based learning, Ms. Ziegler also diagnosed Lauren with dyslexia.[29] She indicated that because Lauren expends so much effort decoding written words, her brain has no extra capacity to comprehend what the words mean. Ms. Ziegler's recommendations included an evidence based approach for teaching reading skills that incorporates phonemic awareness and is delivered by a professional knowledgeable about dyslexia; a multisensory approach that incorporates visual and kinesthetic learning; and speech and language therapy. Specifically, Ms. Ziegler reported that given Lauren's dyslexia diagnosis, "combined with her deficits in receptive language, working memory and processing speed, she will require an evidence based reading program that is phonemically base, structured, sequential and systematic in the order of introduction that also provides repetition and consistency." (P-18; Ziegler)

17. Following these evaluations, Ms. Ziegler observed Lauren over two days at Stony Hill in October 2014. As part of her observation, Ms. Ziegler spoke with Lauren's classroom teacher. Ms. Young reported that Lauren was having difficulty at the basic letter sound correspondence level and that on her written work she frequently used the strategy of guessing, "as the sentences she wrote contained words that did not relate to the overall intended meaning of her sentence." Ms. Young also stated that Lauren's listening comprehension was better than her reading comprehension, and that Lauren often needed materials to be read aloud to her in order to answer questions. (P-19)

Lauren's parents requested that Ms. Ziegler be permitted to observe an entire school day, but they were told that Ms. Caruana needed to be present and a full day was not possible due to her schedule and competing demands on her time. (Mother) Ms. Ziegler spent an hour and a half at Stony Hill on the morning of October 22, 2014 observing Lauren in both her general education language arts block with Ms. Young and her pull-out reading support with Ms. Gelinas. In language arts, Ms. Ziegler noted that Lauren was fidgety, inattentive, and withdrawn and that she did not participate fully in whole group classroom activities. She did not appear to be able to maintain the pace of the instruction. Moreover when asked to read the word "tub," Lauren was incapable of doing so and did not attempt any strategies to sound it out. Even with her teacher's prompts, she reversed the

---

[28] The Gallistel-Ellis Test of Coding Skills measures whether a student can recognize and produce the sounds for various letters, units, or clusters of letters, as well as certain words made up of these sounds. This test does not use normative data. (P-18; Ziegler)

[29] Although several witnesses for the District pointed out that Lauren's cognitive abilities had been below average on earlier evaluations, no evidence was presented by the District to contradict Lauren's dyslexia diagnosis.

phonemes and sounded out "but," identifying the word properly only after her classmates whispered the correct answer to her. Ms. Ziegler observed that Lauren relied on teacher prompts or peers for answers, which demonstrates that she cannot discern the answer independently. During small group center time, Lauren participated in small group reading instruction with her teacher, but was pulled out in the middle of the exercises for instruction with Ms. Gelinas. (P-19; Ziegler) According to Ms. Caruana, who was present during Ms. Ziegler's observation, Lauren's entire small reading group left the classroom together to meet with Ms. Gelinas. (Caruana)

During Lauren's time with Ms. Gelinas, which included two other students, Ms. Ziegler observed that Lauren echoed classmates' responses frequently rather than responding to questions independently, which she explained indicated that either Lauren didn't have the processing time she needed to respond or she did not know the letters being targeted. Ms. Ziegler also noted that the teacher engaged in "maximal cuing," rather than a "socratic teaching method of self-discovery and scaffolding" such as those used in successful evidence based reading programs to enable students to internalize strategies for developing their independence rather than relying on others to tell them the answer. Ms. Ziegler stated that the cueing she observed consisted of Ms. Gelinas giving Lauren the letter or sound or sounding out the letters for Lauren, rather than encouraging her to sound out and segment words independently, the preferred precursor for reading and spelling. Following her observation, Ms. Ziegler conferred with Ms. Gelinas regarding Lauren's progress. Ms. Gelinas reported that Lauren did not like to be pulled out of the regular education classroom, frequently asking to go back. At this time, Ms. Gelinas reported that she would like to work more one-on-one with Lauren but that the demands of the general education curriculum and the layout of the school day make that challenging. She also explained that she met with Lauren for half an hour in the mornings to provide phonics support. This additional pull-out session was not reflected in her IEP. (P-19, Ziegler)

Ms. Ziegler observed this extra pull-out on the morning of October 29, 2014. Lauren and two other students participated in a letter sorting activity. Ms. Ziegler noted that when Lauren made mistakes, such as confusing upper and lower case letters, or did not know how to approach a task such as identifying initial sounds of words, the teacher simply gave her the correct answer. Ms. Haywood testified that she was present for this part of the observation, and reported that Lauren was paying attention and engaged with the lesson during this time. (P-19; Haywood; Ziegler)

Ms. Gelinas reported to Ms. Ziegler that the District's remedial reading programs included Read Naturally, Lindamood-Bell, Visualizing and Verbalizing, and Seeing Stars.[30] According to Ms. Ziegler, the District's use of these evidence based programs is "piecemeal," and has failed to teach Lauren effectively the strategies she needs to independently decode and recognize and learn the alphabet letters and their corresponding sounds. Ms. Ziegler also reported that phonemic awareness instruction was not being incorporated in the general education classroom, which she identified as

---

[30] According to Ms. Ziegler, Ms. Gelinas also used a word study program from Sanford Roth and "some work" from Fountas and Pinnell. (Ziegler)

problematic because instruction for dyslexic students like Lauren must address the phonological processing component of language on daily basis during intervention. Based on her observations, Ms. Ziegler concluded that being a large classroom seemed to be overwhelming for Lauren giving her learning profile, which does not allow her to process information quickly enough to benefit from the general education setting. She described Lauren as a student who used guessing as a strategy and followed her classmates to arrive at answers, "had really low self-esteem in her own reading abilities and was developing signs of learned helplessness, which is very concerning to see in a second grader."(Ziegler)

Ms. Ziegler recommended that Lauren be educated in a language-based program[31] that interweaves targets throughout her day and across subject areas, employing repetition and consistency and the presentation of targets in a structured, sequential, multisensory manner; and that she be instructed by a teacher who is trained in an evidence based reading program that incorporates phonological awareness. (P-19; Ziegler)

18. Ms. Caruana was present during Ms. Ziegler's observations of Lauren at Stony Hill. She testified as to her interpretation of what she and Ms. Ziegler saw. According to Ms. Caruana, the fact that Ms. Young had to read materials aloud to Lauren is not "a negative." The practice is comparable to reading directions to children during "the math MCAS so that they can learn the material without having to decode." Ms. Caruana also testified, in response to Ms. Ziegler's reported concerns about Lauren's difficulty reading the word "tub," that reversals are not uncommon in the second grade. (Caruana)

Ms. Caruana characterized Lauren's practice of echoing during her pull-out with Ms. Gelinas as a sign that she is paying attention in class, which means that she is "dealing with her attention deficits." She suggested that when Lauren echoes her classmates' answers, she "learns them" for herself. Ms. Caruana also indicated that frequent cuing may have been an intentional effort on the part of Ms. Gelinas to prevent Lauren from becoming "frustrated and embarrassed" in front of her observers. (Caruana)

19. Lauren's Team reviewed the results of Ms. Ziegler's evaluation at a meeting held on November 3, 2014. (S-13) Ms. Young reported at this meeting that Lauren required frequent check-ins, prompting, and redirection to stay on task. Ms. Young also reported that Lauren performed best in small groups. (Mother) Ms. Gelinas noted that Lauren was having difficulty decoding when reading, and that she was "very insecure with her reading and often…just guess[ed]." (Mother)

At this meeting, Lauren's mother also raised concerns about Lauren's self-esteem, sharing that she was crying every day, frustrated that she did not know how to read and understanding that others could tell she was struggling. Ms. Caruana had seen some withdrawal and hesitation on Lauren's part at school, though she had not seen tears and

---

[31] Ms. Ziegler testified that a "language-based" classroom is one provided by a teacher knowledgeable about language development and strategies for working with students with language processing issues who employs strategies such as pausing to check in with students to make sure they are comprehending,, and breaking instruction into smaller more meaningful units so that it is not overwhelming.

had not noticed any resistance from Lauren with regard to her pull-out services. (Caruana) Ms. Haywood surveyed Lauren's teachers about her emotional wellbeing, and none of them expressed concern about her being upset or withdrawing. Ms. Young did note, however that at times Lauren appeared frustrated with some of her work, but she was able to get through it when moved to a small group. (Haywood) Ms. Caruana explained to Lauren's mother that the District could provide counseling services, but she was concerned about the number of pull-outs already in Lauren's schedule.[32] (Mother)

As a result of this meeting, Lauren's IEP (dated 05/20/2014- 05/19/2015; see S-12) was amended to include additional B-Grid services in mathematics (five times a week for forty-five minutes each time, up from thirty)[33] and additional C-Grid pull-out services in mathematics[34] (five times a week for forty-five minutes each) and speech and language (twice a week for thirty minutes each time), for a total of 12 pull-outs per week. (S-13) According to the testimony of her mother, Lauren also received additional instruction in phonics on an irregular basis even though these services were not included in her IEP.[35] Parents accepted this IEP amendment on November 30, 2014, but noted that they continued to feel that the "services offered [were] inadequate to meet [Lauren's] disability." (S-13; Mother)

[32] Ms. Caruana clarified in her testimony that she was responding to Lauren's mother's concern and believed that if Lauren's self-esteem was tied to her lack of progress, once more "direct [] specialized instruction in a systematic way was given," Lauren would start to make progress and begin to "feel good about herself." She testified that she expressed to Lauren's mother that she should "give [Lauren] a little time." (Caruana) Ms. Haywood confirmed in her testimony that the possibility of adding counseling with the School Adjustment Counselor was discussed, but a final decision was not made at this meeting. (Haywood)

[33] Under the IEP amendment proposed at the November 3, 2014 Team meeting, B-Grid math services were scheduled to end on November 2, 2014, effectively terminating upon Parents' acceptance. Ms. Haywood testified that this was the District's intention, and that Lauren's math support was changed, through this IEP, from a B-grid to a C-grid service to permit teaching at a slower pace, individualized to each student's level. (Haywood) However, because the District simultaneously increased and removed B-Grid math services, and there are no documents in evidence that reflect a corresponding change in Lauren's schedule, it is unclear whether the District intended to continue providing B-Grid math services following the November 3, 2014 Team meeting. In any event, the IEP as amended on November 3, 2015 specified that Lauren would receive both B-grid and C-grid mathematics support five days a week for forty-five minutes each, for a total of ninety minutes of math support a day. (P-7) Asked to identify these sessions on Lauren's schedule upon cross-examination, Ms. Caruana could locate only two B-grid math period per week. She stated that she believed Lauren's classroom teacher "found" another forty minutes two times a week in which she delivered this instruction. (Caruana)

[34] In her testimony, Ms. Caruana stated that students require 70 minutes of math per day in order to complete the elements of Stony Hill's "Envisions" math program. (Caruana) At the time that this amendment was signed, however, Lauren was receiving 45 minutes per day in pull-out math and 40 minutes of inclusion math twice per week, for an average of 61 minutes of math per day. (P-25) Caruana testified that Ms. Young "squish[ed]" Lauren's 'quiet time' and inclusion writing blocks in order to get through the lessons of Envisions. "Quiet time," according to Ms. Caruana, occurs after lunch and is designed for students to engage in sustained silent reading, finish morning work, confer one-on-one with the teacher, work in small groups, or otherwise catch up. The schedule provided with Lauren's next IEP contained 75 minutes of math per day in compliance with its proposed B- and C-Grid services. (P-26; S-18) Lauren's new schedule also reflected a shortened "quiet time;" Ms. Caruana testified that "quiet time" has always been 15 minutes, but was inflated on Lauren's past schedule (P-25) in order to accommodate additional, unscheduled math instruction. (Caruana)

[35] Lauren's mother may have been referring to the additional services provided by Ms. Gelinas in the mornings, mention by Ms. Caruana in her testimony and described at Finding 17, above.

20. Speech and language services implemented following this IEP amendment were provided by Ms. Judith Bono. (S-13; Bono) Ms. Bono holds a Master's degree in Communication Disorders/Speech and Language Pathology and is certified by DESE as a Speech and Language Pathologist. She is also licensed by the Massachusetts Board of Registration of Speech and Language Pathology and holds a Certificate of Clinical Competence in Speech and Language Pathology (CCC-SLP). Ms. Bono is certified a member of the Phono-Graphix Association of Reading Specialists and the American Speech-Language-Hearing Association. (Bono) Ms. Bono has worked in public schools as a Speech and Language Pathologist since 2004 and has been with the District since 2006, performing screenings, providing speech therapy services both within general education classrooms and through pull-outs, and consulting with teachers and special educators. (S-43, Bono) Ms. Bono has completed training in Lindamood-Bell programs such as LiPS, Visualizing and Verbalizing, and Seeing Stars. She has experience working with children with expressive and receptive language delays, ADHD, and dyslexia. (S-43)

The speech/language goal that Ms. Bono wrote for the November 2014 amendment to Lauren's 05/20/2014- 05/19/2015 IEP included benchmarks in comprehension, processing, and phonological awareness, which were to be the focus of twice weekly thirty minute pull-out services. (S-13; Bono) Though she had not worked with Lauren herself prior to writing this goal, Ms. Bono incorporated Ms. Ziegler's recommendations for intervention in receptive language, comprehension and processing skills, and phonological awareness. (S-39; Bono) In her testimony, Ms. Bono described her instruction as "language-based," with lessons that are structured, entail much repetition, and include work from Lauren's content areas in the general and special education classrooms. Ms. Bono testified that she used both Phono-Graphix, a research-based, Orton-Gillingham-based program that focuses on learning the code of letters and sounds, and Lindamood-Bell's Seeing Stars, during her sessions with Lauren.[36] She disagreed with Ms. Ziegler's characterization of Lauren's service delivery as "scattered and uncoordinated," pointing out that she consulted with both Ms. Young and Ms. Gelinas in her planning for Lauren's sessions. Asked whether Lauren appeared upset about being pulled out of class for speech and language services, Ms. Bono testified that Lauren had exhibited no resistance when prompted for the four pull-out sesions they had together during December 2014. (Bono)

21. Lauren's parents notified the District of her decision to unilaterally place Lauren at the Curtis Blake Day School by letter on December 2, 2014. (P-34) Lauren's mother testified that she has always had a good relationship with the District and believes the Team was doing all it could to provide Lauren with what she needed. The services they had at their disposal were, however, inadequate to meet her needs. (Mother) In response to this letter, the District scheduled a Team meeting for December 16, 2014. (S-17; Caruana) At this meeting Lauren's teachers presented information about her progress. Ms. Gelinas presented data showing growth in Lauren's sight words from September to December (from 28/50 to 88/125) and Curriculum-Based Reading Measurements (41 words per

---

[36] Ms. Bono testified that students engaged in "air writing" (drawing letters in the air with their fingers) as part of Seeing Stars instruction in order to help them visualize different letters and sounds. When she used Seeing Stars with Lauren during her pull-outs, Lauren did not appear to recognize the activity. (Bono)

minute read correctly in December, up from 19 in October). (S-28) Ms. Caruana indicated that as the number of sight words increases, so too does difficulty. Therefore, though as a matter of percentages the increase in her sight word recognition does not seem significant, Ms. Caruana testified that this shows "good growth." (Caruana) Parents were also presented with a progress report from Ms. Bono, which showed that Lauren was "filling in the blank with consonants" at 78% accuracy, "with vowels" at 67% accuracy, and with a "combination of consonants and vowels" at 89% accuracy; Lauren also scored "100% correct on rhyming words." [37] (S-18; S-31; Bono) Ms. Bono testified that the work on which her report was based was completed independently after initial instruction in a group with two other students. (S-31; Bono)

Following this meeting a new IEP was developed. [38] Lauren's mother testified that she was open to hearing what the Team proposed at this meeting and that she would have been willing to keep Lauren at Stony Hill had the Team proposed a language-based program.

This IEP, dated 12/16/2014-12/15/2015, proposed placement in a full inclusion [39] program at Stony Hill. (S-18) A-Grid consultations were added in reading, mathematics and speech and language, once a week for fifteen minutes for each of these subjects. Ms. Caruana testified that these consultations were added in order to foster collaboration between classroom teacher Ms. Young, special educator Ms. Gelinas, and Speech and Language Pathologist Ms. Bono. [40] (Caruana) In addition, B-Grid mathematics services were reduced to five times a week for twenty-five minutes each time. This IEP also added new C-Grid pull-out services in phonemic awareness [41] (twice a week for forty minutes each time and once a week for twenty-five minutes), as well as social/emotional support (once a week for thirty minutes) to address concerns about Lauren's self-esteem. These services were added to Lauren's existing pull-outs in mathematics (five times a week for forty-five minutes each time), speech and language (twice a week for thirty minutes each), and reading/decoding (five times a week for forty-five minutes each). In total, this IEP proposed 16 pull-outs per week. (S-18)

---

[37] Ms. Bono's progress report is dated 12/9/2014. The following page in School Exhibit 31, however, shows that three of Ms. Bono's meetings with Nicole took place after December 9, 2014 -- on December 10, 13, and 17. It was on these days that Ms. Bono reported the data described here. Ms. Bono testified initially that she did in fact write her progress report on December 9, 2015, even though it would appear that she could not yet have the data it contained. She later testified that it was "an error in the date."(Bono)

[38] Although Lauren's parents had already notified the District of their intent to place Lauren unilaterally, this IEP is the last one proffered prior to Lauren's removal from the District and it is this IEP I consider in determining whether the District had offered Lauren a free, appropriate public education at the time of her unilateral placement.

[39] Though the PL-1 of the 12/16/2014-12/15/2015 IEP classifies Lauren's proposed placement as "full inclusion," calculations by the District's counsel in the course of this hearing revealed that Lauren actually spent approximately 33% of her time outside of the general education classroom each day, which would make the placement "partial inclusion." (S-18)

[40] Ms. Spanos-Gearing, occupational therapist for the District, was added as a service provider pursuant to an IEP amendment that followed the January 16, 2015 Team meeting. (S-20; see Finding 22, infra) Ms. Haywood testified that specific planning time would have been scheduled under the 12/16/2014-12/15/2015 IEP, as amended, to permit Lauren's five service providers, Ms. Gelinas, Ms. Young, Ms. Bono, Ms. Henrich, and Ms. Spanos-Gearing, to meet and coordinate their instruction to ensure that Lauren's program was not "disjointed." (Haywood)

Lauren's phonemic awareness goal was authored by Terrie Henrich,[42] who testified that phonemic awareness was the "big missing piece in [Lauren]'s program. In order to write this goal, Ms. Henrich pulled Lauren out of class in early December to assess her performance through informal testing.[43] Ms. Henrich was not in attendance at the December 16, 2014 Team meeting to present the goal she had written to Lauren's parents. (Henrich)

Ms. Caruana testified that the proposed services in phonemic awareness were to have been delivered by Ms. Henrich, who would also be Lauren's teacher in the Focus classroom, described below. (Caruana) Ms. Henrich did not provide direct instruction to Lauren during her time at Stony Hill, however, because phonemic awareness services were not offered until after Lauren's mother had notified the District that she would be placing Lauren at Curtis Blake Day School. (S-18)

Parents accepted the IEP as developed, but noted once again that they believed the services offered by the District were inadequate to meet Lauren's needs. (S-18) Parents signed the IEP but refused placement in Hampden-Wilbraham on December 27, 2014.[44] (S-18) Lauren's last day at Stony Hill was December 17, 2015. (Bono)

22. Lauren's Team met again on January 16, 2015 to review the occupational therapy evaluation conducted on December 12, 2014 by Hampden-Wilbraham Occupational Therapist Allison Spanos-Gearing. (P-10) This evaluation revealed below average performance in spatial relations, as Lauren wrote large, oversized letters and had difficulty staying within the lines on double-lined paper.[45](S-41) All other subtests were within the average range. Based on these results, the District proposed an amendment to the 12/16/2014-12/15/2015 IEP, adding C-Grid services in occupational therapy once a week for thirty minutes. This brought the total number of pull-outs proposed by the District to 17 per week. (S-18)

23. Parents accepted the amendment as written on March 26, 2015, but continued to note the inadequacy of the proposed services. (S-20)

24. When asked during the hearing whether this IEP was appropriate for Lauren, Dr. Miles testified that it contained too many pull-outs for Lauren and failed to reflect a language-based program. Given Lauren's profile, she does not believe that Lauren would demonstrate meaningful progress under this IEP. (Miles)

---

[42] Ms. Henrich's qualifications are described in detail at Finding 36, *infra*.

[43] Ms. Heinrich testified that due to inconsistent and/or missing information regarding Lauren's abilities, additional testing was required in order for her to get a sense of Lauren's current performance level. Parents were not notified of this testing; Ms. Henrich testified that parental notification is not "protocol" for the kind of informal testing she performed. Results of this testing are detailed in School Exhibit 18 (goal 5). (Henrich)

[44] The District's Focus Program, described at Finding 36, *infra*, was not offered at this time. (Bono)

[45] Ms. Spanos-Gearing used the Developmental Test of Visual Perception (DVPT-2) and her clinical observations to evaluate Lauren. (S-41)

25. Asked during the hearing whether this IEP was appropriate for Lauren, Ms. Ziegler also expressed concern about the number of pull-outs, which she believed created too many transitions for Lauren as a student with ADHD and deficits in processing, reading, and written language. (Ziegler)

C.   Curtis Blake Day School

26. Lauren began attending Curtis Blake Day School in January 2015. Curtis Blake was a substantially separate DESE-approved school for students in grades K-9 with language-based learning disabilities.[46] Curtis Blake employed teachers with degrees in special education and/or certification as reading specialists, as well as speech/language pathologists. The school maintained a rigorous professional development program for its staff, many of whom had significant experience. (Lafontaine)

At the time of the hearing, Linda Lafontaine served as both principal and speech/language pathologist at Curtis Blake, having previously served as the school's supervisor of speech/language pathology and assistant principal during the course of her almost eighteen years there. In these capacities she is responsible for day-to-day operation, curriculum, and staff supervision in addition to direct instruction. Ms. Lafontaine has a Master's degree in Speech Pathology a Certificate of Clinical Competence in Speech-Language Pathology (CCC-SLP), and CAGS certification as a Reading Specialist. She holds Massachusetts licenses in speech pathology and reading (initial license) as well as an endorsement in sheltered English Immersion. Ms. Lafontaine also is licensed in Speech/Language/Hearing Disorders (all levels) and Elementary Education (K-8), and certified by the American Speech & Hearing Association. Prior to her time at Curtis Blake, Ms. Lafontaine worked as a speech/language pathologist in both scholastic and clinical settings for 15 years. In addition to her current position at Curtis Blake, Ms. Lafontaine teaches CAGS courses on dyslexia and comprehension strategies instruction as an adjunct professor. Ms. Lafontaine is trained in the application of evidence-based programs such as Lindamood-Bell's Seeing Stars, Read Naturally, and Visualizing/Verbalizing, as well as Story Grammar Marker and ThemeMaker. (P-28; Lafontaine)

Ms. Lafontaine testified that Curtis Blake admitted students with average to above average intelligence (as measured by the WISC) who were diagnosed with learning disabilities. Typical results for Curtis Blake students included verbal comprehension and perceptual reasoning scores in the average to above average range, with lower scores in

---

[46] As of June 30, 2015, Curtis Blake Day School closed in the form in which it existed up to and including the 2014-2015 school year at the American International College location. The school has been approved by the Springfield School Committee for continued operation by the Children's Study Home on its Mill Pond campus in Springfield. The school is losing its DESE approval, but is in the process of reapplying. According to Linda Lafontaine, last year's principal at Curtis Blake, the school is in the process of hiring current staff to return to the school at its new location next year. Current plans are to retain the same programming and strategies as were utilized at Curtis Blake at its old location, but these plans were still tentative at the time of hearing. (Lafontaine) Because Curtis Blake is now closed, the past tense is used here to describe the school as it existed when Lauren attended between January and June, 2015.

processing speed and working memory. According to Ms. Lafontaine, students with low scores in these areas have difficulty holding a lot of information in their working memories, which requires modifications in the ways in which they are taught. Additionally, students at Curtis Blake typically had issues with attention, impulsivity, and organization, as well as difficulty with oral and written language and mathematics. When evaluating a student for admission, administrators at Curtis Blake considered psychological testing, speech and language testing, and academic testing, as well as the child's most recent IEP. Ms. Lafontaine, who was personally involved in Lauren's admissions decision, testified that she received the results of Dr. Miles' evaluation in May 2014. At this time, administrators at Curtis Blake conducted what Ms. Lafontaine describes as a "cursory review" of this information, with the understanding that more of Lauren's records were forthcoming. In October 2015, Lauren's mother sent Lauren's additional testing from Alicia Ziegler; at this point, Curtis Blake had also received Lauren's IEP from the District and the results of Lauren's evaluation at Learning Solutions. (Lafontaine)

Citing Dr. Miles' report, Ms. Lafontaine testified that Lauren exhibited the hallmark split between verbal comprehension/perceptual reasoning scores and working memory/processing speed scores on the WISC. Ms. Lafontaine also noted that Lauren's CTOPP scores revealed phonological difficulties typical of Curtis Blake students' profiles. Citing Ms. Ziegler's report, Ms. Lafontaine testified that Lauren's CELF results showed difficulty comprehending oral language, which was typical of Curtis Blake students. Lafontaine also noted that Lauren's GORT testing showed "severely depressed" abilities in the areas of reading rate, accuracy, fluency, and comprehension, another hallmark of Curtis Blake students. Based on this information, Ms. Lafontaine determined that Lauren was a viable candidate, and she was accepted to Curtis Blake. (Lafontaine)

27. When Lauren first arrived at Curtis Blake she was hesitant to write and get information on paper. She did not communicate much orally either, and often answered a question with a question. (Lafontaine) In addition to these initial impressions, Curtis Blake conducted evaluations of Lauren upon her enrollment in January 2015. (P-30) Ms. Sue Timme,[47] a teacher at Curtis Blake, administered testing to determine Lauren's ability to spell certain short- and long-vowel sound patterns; she received a score of 51 out of 85. Lauren's classroom teacher, Nancy Marchand,[48] administered the Wide Range test for math. Lauren's results indicated that her math skills were at a first grade level, and as a result, she was placed in a first grade math class. Informal Lindamood testing conducted by Ms. Lafontaine showed that Lauren had difficulty reading and spelling some basic vowel sounds. Reading evaluations conducted by Ms. Marchand using the Burns/Roe Informal Reading Inventory placed Lauren's reading level below the beginning first grade level. Lauren was able to read some words in isolation at the pre-primer or primer level, but did not demonstrate the ability to read connected text. Based on these results and after working with her for a few weeks, Curtis Blake generated an IEP for Lauren. This IEP provided services in reading, language and literature, social

---

[47] Ms. Timme's *curriculum vitae* is not in evidence.
[48] Ms. Marchand's *curriculum vitae* is not in evidence.

thinking/pragmatics, phonemic awareness and phonics, and decoding/spelling, as well as specials in art, music, and physical education. (P-31; Lafontaine)

28. Lindamood-Bell programs such as LiPS, Visualizing and Verbalizing, and Seeing Stars, as well as Benchmark Word Identification and Thememaker programs, were utilized in Lauren's instruction at Curtis Blake, as were Story Grammar Marker and Social Thinking. (Ziegler; Lafontaine) These language-based programs were applied across the curriculum by teachers and instructional assistants trained in their delivery, with the goal of helping students "crack the code" and learn to "get the print off the page" as soon as possible in order to get them to enjoy reading and want to move forward, in addition to preventing them from falling further behind in acquisition of vocabulary. (Lafontaine) In addition, Ms. Ziegler testified that Lauren's teachers utilized a multisensory approach across her day, incorporating visual and tactile cues to illustrate targeted concepts. (Ziegler)

29. Lauren's classroom at Curtis Blake was home to five students who were instructed by her classroom teacher, Ms. Marchand, and an instructional assistant. (Lafontaine) Ms. Marchand taught Lauren's language and literature, writing, and reading classes, as well as her social studies and science blocks. (P-32; Lafontaine) Lauren received language and literature lessons four days per week at Curtis Blake; these blocks were supervised or co-taught by Ms. Lafontaine. (Lafontaine) Phonemic awareness instruction took place four days per week and was delivered by Ms. Lafontaine, who used the Lindamood phoneme sequencing program. Lauren's Benchmark block was taught by Ms. Timme. In this class, Lauren received orthographic instruction which built upon the phonemic awareness skills she learned with Ms. Lafontaine. (Lafontaine) Lauren's reading block with Ms. Marchand was designed to help her implement the strategies she learned in her other classes in order to process written text. (Lafontaine) During Centers, Lauren performed activities related to language and literature, phonemic awareness, social studies, science, or math. Lauren left her homeroom for math and Benchmark classes, but Ms. Lafontaine testified that there was "not something going on in her classroom" that she was missing; rather, students were working in centers with the instructional assistant or reading with Ms. Marchand. (Lafontaine) According to Ms. Lafontaine, there was never a time when Lauren was removed from the classroom in the middle of a lesson. (P-32; Lafontaine)

30. At the end of the school year, Lauren was retested using the same tests administered upon her enrollment in January.[49] On the Burns/Roe she passed the pre-primer level[50] and her word recognition isolation increased by one level. Benchmark testing demonstrated that Lauren had learned to read 30 new vowel patterns between January and June. Ms. Lafontaine's informal Lindamood testing showed improvement in reading and spelling basic vowel sounds. Lauren's educators noticed improvements in her confidence,

---

[49] Although Parents submitted Lauren's Curtis Blake progress report, dated April 2015 (P-33), no results based on this end of year testing were generated in writing. Ms. Lafontaine testified that the results of the Burns/Roe were discussed in a chart filled out by Ms. Marchand in the course of an IEP meeting, but this chart is not in evidence. (Lafontaine)
[50] On direct examination, Ms. Lafontaine testified that Lauren passed the pre-primer level, but on cross-examination she testified that Lauren's independent reading level was below pre-primer and her instructional level was at pre-primer level. (Lafontaine)

particularly her willingness to volunteer answers in class; she also became more interactive with peers and improved in her ability to explain why she was employing particular strategies. (Lafontaine) Lauren's mother testified that at Curtis Blake, Lauren was confident, loved school, and was learning. She also noted that Lauren is proud of herself and is applying the strategies she learned at school to reading at home. (Mother)

31. After working directly with Lauren from January to June Ms. Lafontaine concluded, based on this experience in addition to her professional expertise, that the programs and methodology used with Lauren at Curtis Blake are necessary for her to make meaningful progress in language and reading. (Lafontaine)

32. Ms. Ziegler observed Lauren at Curtis Blake on the morning of April 8, 2015 from 8:30 to 12:15 before a break for Lauren's lunch and recess.[51] The first block Ms. Ziegler observed was language arts, co-taught by Ms. Marchand and Ms. Lafontaine using a combination of small group instruction, independent work, and 1:1 support. (P-20) Ms. Lafontaine incorporated a multisensory approach throughout the instruction and employed organizational strategies with Lauren and her peers. (Ziegler) Ms. Ziegler noted that Lauren participated actively in class and with her peers. She was able to elaborate on answers when asked to do so, and when she became distracted by her peers she was redirected successfully by her teachers. (P-20, Ziegler) Ms. Ziegler also observed Lauren working one-on-one with Ms. Marchand for specialized instruction that included activities based on Lauren's difficulty with the short "e" vowel and retelling of a story they had read together using the "Story Grammar Marker rope." (P-20) After Lauren's recess and lunch, Ms. Ziegler observed her thirty minute "Benchmark Class" with Ms. Timme. During this time, Lauren and two other students participated in activities that included reading sentences from their homework, identifying spelling patterns in target words (the same words used in Lauren's earlier phonemic awareness instruction with Ms. Lafontaine), and completing a worksheet containing fill in the blank sentences. (P-20; Ziegler)

Ms. Ziegler reported that Lauren's teachers at Curtis Blake used evidence-based programs such as Story Grammar Marker and Lindamood-Bell. Moreover language-based instruction was implemented throughout Lauren's school day, coordinated such that the same target words were utilized for her spelling list, her phonemic awareness work and her benchmark class. Teachers cued and scaffolded appropriately, permitting Lauren to self-discover her errors. (Ziegler) Additionally, Ms. Ziegler noted that Lauren was "confident, engaged, and joyful" in the classroom at Curtis Blake, in contrast to her time at Hampden-Wilbraham, when she was "withdrawn, shy, and anxious." Going forward, Ms. Ziegler recommended a language-based education program delivered by teachers who specialize in teaching students with dyslexia and language-based learning

---

[51] *See* P-32. According to Lauren's schedule at Curtis Blake, Ms. Ziegler would also have observed a social studies/science block and a centers block during this time period. However, Ms. Ziegler only reported on language and literacy (which she calls "ELA") and reading. Ms. Lafontaine clarified in her testimony that staff at Curtis Blake altered Lauren's schedule on the day of Ms. Ziegler's visit in order to accommodate her request to observe only literacy classes, not social studies and science. (Lafontaine)

disabilities, a small student to teacher ratio, and a multisensory approach implemented on a daily basis. (Ziegler, P-20)

33. Although much was up in the air regarding the future of Curtis Blake at the time of her testimony, Ms. Lafontaine indicated that she expects Curtis Blake in its new form to be approved and she expected at least twenty four students to enroll for the 2015-2016 school year even if the school had not yet received approval. (Lafontaine)

34. Following the filing of the instant Hearing Request on March 27, 2015, Lauren's Team convened for a resolution meeting on April 13, 2015. The summary of this meeting reflects Parents' concerns regarding the number of pull-outs proposed by the District. (S-25) The District reported that Lauren was "making progress" during her "short time at Stony Hill" and recommended that she participate in the summer academic clinic held at Soule Road Elementary School in Hampden-Wilbraham in the summer of 2015. (S-25). Other than Lauren's participation in this summer program no action was taken as a result of this meeting and no new services were proposed.

35. The District convened a meeting of Lauren's Team on June 19, 2015. Lauren's mother received a meeting invitation on June 11, 2015, which lists the purpose of this meeting as a "Review of Programming." (S-27) Upon her arrival, however, Lauren's mother was told by Ms. Caruana that the meeting was a "resolution meeting to discuss programming issues…." (Mother) Though Ms. Caruana was quickly corrected, Lauren's mother left the meeting. Dr. Tobias testified that the purpose of this meeting was to present the Focus Program to Lauren's parents.[52]

D.   Stony Hill's Proposed Focus Program

36. For 2015-2016, the District proposes placement of Lauren in its Focus Program,[53] a substantially separate[54] language-based classroom at Stony Hill that will be run by Terrie Henrich. (S-29) Ms. Henrich has a Master's degree in Special Education and is currently DESE-certified to teach regular education grades 1-6 and special education grades PreK-9.. (S-44; Henrich) She has been teaching since 1987. In 1995, Ms. Henrich began working at the Curtis Blake Day School as a teacher for students aged 7-13 with language-based learning disabilities; she also began working at the Curtis Blake Summer Clinic in 1996. Ms. Henrich remained at Curtis Blake for six years, serving as a homeroom teacher responsible for delivering individualized reading instruction for six

---

[52] This meeting occurred on the Friday before the Tuesday on which the hearing on this matter was scheduled to begin. Even if the purpose of this meeting was to propose the Focus program to Lauren's family, both sides were represented by counsel. Best practice for this contact, so close to the hearing date, would have been through counsel.

[53] Focus was referred to in testimony as both a program and a classroom. The two terms are used here interchangeably.

[54] School Exhibit 29, a description of the Focus Classroom, characterizes the Focus Program as a "partial-inclusion" model. Based on Ms. Henrich's understanding, as she testified at hearing, students would spend "a little over 50 percent" of their time outside the general education classroom, which would qualify the program as "partial inclusion." Ms. Tobias, however, testified that though they are still "fine-tuning the details," Focus students would spend 61% of their time outside of the general education classroom, which would make the program "substantially separate." Despite the lack of clarity, I have characterized the program as substantially separate here.

students, planning centers for additional students, and attending phonemic awareness classes taught to her students by Linda Lafontaine. Although she had left the day school, Ms. Henrich continued to teach in Curtis Blake's Summer Clinic until the end of the 2014-2015 school year, working with students one at a time on the same programs used at the school during the year. Ms. Henrich began working at Hampden-Wilbraham in 2001 as a fourth grade teacher in an inclusion class. In 2011, she became a special educator for grades two and three, in which capacity she remains today. Her position involves working with a caseload of children with different disabilities, including reading and autism. She conducts assessment, delivers instruction, develops and implements IEPs, meets with parents, creates progress reports, and monitors progress. (Henrich) Ms. Henrich is trained in research-based programs such as Lindamood-Bell's Visualization and Verbalization, Seeing Stars, and LiPS; Story Grammar Marker; ThemeMaker; and the Envisions math program. (S-44; Henrich)

Ms. Henrich is described by her principal as "our most valuable person in the school for phonemic awareness." (Caruana) Linda Lafontaine, who knows Ms. Henrich from her time at Curtis Blake, also testified that Ms. Henrich is a skilled reading teacher who "did a great job integrating the strategies" in the program. (Lafontaine)

The proposed Focus Program would include writing, social skills, listening comprehension skills and math, based on the underpinnings of a successful reading program: phonemic awareness, comprehension, fluency and sight words. The program would incorporate executive functioning, organizational and pragmatic skills. The curriculum would be primarily Lindamood, with comprehension elements – Story Grammar Marker, ThemeMaker – and Social Thinking built in.[55] (S-29; Henrich)

As described in a document created by Ms. Henrich and in testimony at the hearing, the Focus Program would serve 3-5 students with learning disabilities in language development, reading, written language, and/or mathematics, who would receive their reading, writing, and math instruction one-on-one or in small groups in a separate classroom with Ms. Henrich. (S-29; Henrich) In addition, students in the Focus Classroom would receive support from a paraprofessional.[56] (Henrich) Opportunities for inclusion would occur during morning meetings (when students would be accompanied by Ms. Henrich) and "specials" (electives), when students are given the chance to interact with typical peers in art, music, the computer and science labs, the library, and the gym. (Henrich) Social studies and science instruction would take place in the general education setting, where students would also be accompanied by Ms. Henrich.[57] (Henrich) In the

---

[55] Ms. Henrich testified that during her time at Curtis Blake, instruction was given using "very nearly the same" programs. The advantages of the Focus program, in her opinion, include the diversity of the student body in the public schools, better electives, and more rigorous science and social studies programs.

[56] According to School Exhibit 29, a description of the Focus program, staff would also include a speech/language pathologist, a school adjustment counselor, an occupational therapist, and "related service providers as required by students' IEPs."

[57] Ms. Henrich testified that she would like to work with Lauren's homeroom teacher in order to train him or her to support the development of reading skills in the teaching of content such as science and social studies. This strategy is designed to reinforce self-monitoring and encourages students to ask whether clarification is required, which helps students to hone their reading comprehension skills as they learn their content areas. (Henrich) This reciprocal

event that not all Focus students are making progress at the same rate, Dr. Tobias testified that Ms. Henrich and the paraprofessional would work together to make sure that students who are able push into the inclusion setting are accompanied during that time, and that students who are not yet ready for content area work in the general education setting receive their programming elsewhere.[58] (Tobias) According to Ms. Henrich, the Focus program is consistent with recommendations for Lauren in the reports of both Dr. Miles and Ms. Ziegler, and actually provides more intervention than is recommended by including instruction in phoneme sounds as well as printed text. (Henrich)

There was some inconsistency among witnesses for the District as to when exactly the Focus program came into being. According to Dr. Tobias, the idea for the Focus program at Stony Hill began forming after a meeting she had with the four Hampden-Wilbraham ETLs in March 2015, when she heard about something more intensive developing at the middle school level in response to students' needs. Sometime around May, she started thinking about revitalizing Focus programming at Stony Hill.[59] Dr. Tobias testified that she began to discuss the revitalization of this program with Ms. Caruana and Ms. Haywood in May 2015. (Tobias) Ms. Bono testified that she first heard about the program sometime in the spring, likely in May. (Bono) The new Focus Classroom at Stony Hill was presented in a more concrete form to the District Superintendent and Assistant Superintendent around the third week of May and later approved by the Superintendent. (Tobias)

Dr. Tobias testified that the District requires three students to make the Focus program viable for the 2015-2016 school year, though she also stated that the District will definitely run the Focus Program even if the students identified as potential participants do not accept placement there.[60] At the time of the hearing, the District was in talks with parents of several children about possible placement in the Focus program; it did not yet have any accepted placements, and no Team meetings had been scheduled. Dr. Tobias testified that even if these parents did not agree to placement of their children in the Focus program, the students could receive some of their services in the Focus classroom on partial inclusion IEPs. She further testified that if the students initially identified for the program did not agree to placement the District might have other students with whose parents they "may want to discuss . . . this direction." (Tobias) Although evidence was introduced as to some of the students identified by the District as potential Focus program participants, given the fact that none have accepted the placement, as explained above, a review of whether any particular student is an appropriate peer for Lauren would require speculation.

---

[58] Ms. Henrich testified that the program would have flexibility in order to meet the changing needs of its students.

teaching is a way in which reading instruction is applied across the curriculum, consistent with the recommendations of both Dr. Miles and Ms. Ziegler that language-based strategies be implemented across subject areas. (*See* Findings 12 and 16, *supra*).

[59] The District previously offered substantially separate specialized instruction for a group of students with specific learning disabilities staffed by one teacher, two paraprofessionals, and speech-and-language related staff. According to Dr. Tobias, this "Focus" programming existed as recently as 2006. (Tobias)

[60] Ms. Caruana endorsed the notion that the Focus program is a "done deal" and will operate in the district whether or not Lauren participates, because there are other children who need it. (Caruana)

DISCUSSION

A.   Legal Standards: Free Appropriate Education, Least Restrictive Environment, and
     Reimbursement for Unilateral Placement

        The Individuals with Disabilities Education Act (IDEA) was enacted "to ensure that all
children with disabilities have available to them a free appropriate public education" (FAPE).[61]
FAPE is delivered primarily through a child's individualized education program (IEP).[62] An IEP
must be "reasonably calculated to confer a meaningful educational benefit"[63] and tailored to
address each student's unique needs that result from his or her disability.[64]

        Under state and federal special education law, a school district has an obligation to
provide the services that comprise FAPE in the "least restrictive environment."[65] This means that
to the maximum extent appropriate, a student must be educated with other students who do not
have disabilities, and that "removal . . . from the regular educational environment occurs only
when the nature or severity of the disability of a child is such that education in regular classes
with the use of supplementary aids and services, cannot be achieved satisfactorily."[66] "The goal,
then, is to find the least restrictive educational environment that will accommodate the child's
legitimate needs."[67] Removing a child from the mainstream setting is permissible when "any
marginal benefits received from mainstreaming are far outweighed by the benefits gained from
services which could not feasibly be provided in the non-segregated setting . . ."[68]

        FAPE is defined by the IDEA to include state educational standards, which may exceed
the federal floor.[69] Massachusetts FAPE standards seek "to ensure that eligible Massachusetts
students receive special educational services designed to develop the student's individual
educational potential in the least restrictive environment.[70] Moreover a student's IEP must be
designed to enable the student to make "effective progress."[71]

        Finally, "[a]n IEP is a snapshot, not a retrospective. In striving for 'appropriateness, an
IEP must take into account what was . . . objectively reasonable . . . at the time the IEP was
promulgated."[72] The same is true for amendments to an IEP.

---

[61] 20 U.S.C. § 1400 (d)(1)(A).

[62] *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012).

[63] *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 84, 84 (1st Cir. 2012).

[64] See *Bd. of Educ. v. Rowley*, 458 U.S. 176, 181 (1982) (FAPE must be "tailored to the unique needs of the handicapped child").

[65] 20 USC § 1412(a)(5)(A); 34 CFR 300.114(a)(2)(i); MGL c 71 B, §§ 2, 3; 603 CMR 28.06(2)(c).

[66] 20 USC 1412(a)(5)(A).

[67] *C.G. ex rel. A.S. v. Five Town Comty. Sch. Dist.*, 513 F.3d 279, 285 (1st Cir. 2008).

[68] *Pachl v. Seagren*, 453 F.3d 1064, 1068 (8th Cir. 2006) (internal citation omitted).

[69] 20 USC 1401(9)(b); see *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524-25 (2007); see also *Mr. I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 11 (1st Cir. 2007) (state may "calibrate its own educational standards, provided it does not set them below the minimum level prescribed by the [IDEA]").

[70] 603 CMR 28.01(3); see MGL c. 69, § 1; MGL c. 71B, § 1.

[71] 603 CMR 28.05(4)(b) (IEP must be "designed to enable the student to progress effectively in the content areas of the general curriculum").

[72] *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) (internal quotations and citations omitted).

Under the IDEA, a parent may be entitled to reimbursement for unilaterally placing a student in private school without the District's consent or referral.[73] Section 1412 provides that a Hearing Officer may order reimbursement for the cost of that placement if the Hearing Officer finds that a District had not made FAPE available to the child in a timely manner prior to the parent's unilateral placement.[74] Hearing Officers and courts have interpreted section 1412 to allow reimbursement for a unilateral placement when 1) the school district had not made a free appropriate public education available to the student prior to that enrollment, and 2) the private school placement was appropriate.[75] The Parents bear the burden of proving that the school district's proposed IEP did not provide FAPE.[76]

B.   Hampden-Wilbraham Regional School District's IEPs and Amendments Thereto for Lauren from May 20, 2014 to the Present Have Not Been Reasonably Calculated to Provide Her with FAPE

It is not disputed that Lauren is a student with a disability who is entitled to special education services under state and federal law. At issue here is whether the IEPs developed for Lauren by the District from May 20, 2014 to the present have been reasonably calculated to provide her with a free, appropriate public education. In other words, I must determine whether the most recent IEP, as amended, placing Lauren in a full inclusion classroom with seventeen pull-outs a week[77] was designed to enable her to make effective progress.

Lauren's most recent evaluations were provided by Dr. Miles and Ms. Ziegler, both of whom were contracted by Lauren's parents to evaluate their daughter. Dr. Miles described Lauren as a student with average abilities whose difficulties with working memory and processing speed hinder her ability to learn to read, and Ms. Ziegler considered this determination of Lauren's cognitive abilities in her diagnosis of Lauren's dyslexia. Relying on its own 2012 evaluation of Lauren in which she displayed below average cognitive skills and Learning Solutions' evaluation of her around the same time, in which she scored below average in some areas (though with the caveat that her inattentive behavior may have impacted the validity of her scores), the District questioned whether her cognitive abilities are actually in the average range. I find Dr. Miles to be credible in her opinion of Lauren's cognitive capacity.

Both Dr. Miles and Ms. Ziegler found that Lauren's disability requires her to expend so much energy decoding written words that she is mentally exhausted before she is able to make sense of the information, and they made similar recommendations regarding her educational needs. Dr. Miles and Ms. Ziegler both recommended a substantially separate, language-based

---

[73] 20 U.S.C. 1412(a)(10)(C)(ii).

[74] See id.

[75] See 20 U.S.C. 1412(a)(10)(C)(ii); *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 369 (1985); *Schoenfeld v. Parkway Sch. Dist.*, 138 F.3d 379, 382 (8th Cir. 1998) ("Reimbursement for private education costs is appropriate only when public school placement under an individual education plan (IEP) violates IDEA because a child's needs are not met"); *In re: Medfield Public Schools*, 13 MSER 365, 371 (Crane 2007).

[76] See *Schaeffer v. Weast*, 546 U.S. 49, 62 (2005) (holding that the burden of proof in an administrative hearing challenging an IEP falls on the party seeking relief).

[77] At the time Parents notified the District of their intent to place Lauren at Curtis Blake, the IEP (as amended) provided for twelve pull-outs a week. By the time Lauren actually began attending Curtis Blake, after the December 16, 2015 Team meeting, five weekly pull-out had been added, for a total of 17. (S-13, S-20)

classroom that applies evidence-based approaches and employs multisensory instruction consistently across Lauren's day to address her difficulties with reading and language. Ms. Ziegler also recommended that she receive speech and language therapy.

Lauren's mother described her as a happy, social child who enjoys interacting with her peers and who resisted being pulled away from them on a regular basis to address her learning deficits. Dr. Miles recommended that Lauren have increasing opportunities for inclusion as those deficits are remediated. I find that Lauren is a student who would benefit from interactions with typically-developing peers.

Based on the information before me, I find that Lauren is a student of essentially average cognitive abilities who has pronounced deficits in reading caused by her disability of dyslexia. I accept the recommendations of Dr. Miles and Ms. Ziegler as an accurate depiction of Lauren's needs at this time. As a result, I find that Lauren requires instruction in a substantially separate, language-based classroom, using evidence based programs and a multisensory approach across all academic areas throughout her school day. I find further that Lauren requires opportunities for inclusion with her typically developing peers.

When Lauren entered the second grade at Stony Hill, she began receiving services under and IEP for a full-inclusion placement that entailed five pull-outs a week to support her development of reading/decoding skills. Her parents accepted these services but rejected the District's failure to provide Lauren with a full language-based program to address her needs, as recommended by Dr. Miles. The IEP may have been "objectively reasonable" for Lauren upon her entrance to Hampden-Wilbraham based on the information before the District at that time. However, as Stony Hill teachers and administrators came to know Lauren, they were able to form a more complete picture of her needs and for the most part, they agreed with Lauren's parents and evaluators that Lauren experienced significant difficulty reading and processing language. No District witness who testified disagreed with the recommendations of Dr. Miles and Ms. Ziegler that Lauren be instructed utilizing evidence based, multisensory approaches, and all witnesses cited the same programs (LiPs, Visualizing and Verbalizing, Seeing Stars, etc.) as appropriate for her. In fact the District was employing many of these programs, and the individuals working with Lauren had the appropriate certification and training.[78] The difference was in the delivery; the District endorsed a full inclusion model and as District personnel became aware that Lauren needed more, the "more" the District provided was in the form of pull-outs. Moreover, despite the fact that she was identified by her principal as the "go to" person within the District for phonemic awareness, Ms. Henrich was not involved in Lauren's programming until after Lauren's parents had notified the District in December 2014 of their intention to place Lauren unilaterally at Curtis Blake. (Caruana, Henrich)

Specifically, following Ms. Ziegler's evaluation, rather than adopt her recommendation and place Lauren in a substantially separate language-based classroom, and in spite of their

---

[78] Although several District witnesses testified that Seeing Stars is a regular part of the remedial reading program Lauren received across her day, Ms. Bono was the only provider of direct services to Lauren who testified on behalf of the District at the hearing, and she stated that when she engaged Lauren in the "air writing" component of Seeing Stars during her pull-out sessions with in December, Lauren did not appear to be familiar with that strategy. *See* note 36, *supra*, and accompanying text.

knowledge of Lauren's resistance to being pulled out of class, as reported by her mother, the Team amended Lauren's IEP to incorporate seven additional pull-outs a week for a total of twelve as of the end of November 2014. Upon receiving notice of Lauren's parents' intent to place her unilaterally at Curtis Blake, once again rather than develop an IEP placing her in a substantially separate language-based classroom as recommended by Dr. Miles and Ms. Ziegler and in spite of their knowledge of Lauren's resistance to pull-outs, the Team determined that it would address Lauren's needs by adding more pull-outs. By the time Lauren's parents actually removed her from Stony Hill, her IEP provided for 17 pull-outs a week.

This IEP, officially classified a "full inclusion" placement, provided at best a "partial inclusion" program based on the District's calculations at the hearing. Even with careful coordination among all instructors and service providers, it would be difficult for a child with Lauren's profile – which includes ADHD, processing and language deficits – to manage 17 pull-outs per week, and as her mother testified, the pull-outs were taking an emotional toll on her. Further, given Lauren's substantial needs, partial inclusion programming was inadequate to provide her with the phonemically-based, structured, sequential and systematic evidence based instruction across the curriculum that she needs to make meaningful educational progress. Thus, despite my finding, *supra*, that Lauren requires opportunities for inclusion with typically developing peers, the benefits she would have received from mainstreaming at this point "are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting . . ."[79]

Despite the substantial information it had in its possession on or before December 16, 2014 demonstrating that this is what Lauren needed,[80] the District did not offer her a substantially separate language-based program. Its failure to do so, and its proposal of seventeen pull-outs per week instead, was not "objectively reasonable."[81] I find that the IEPs proposed for Lauren from May 20, 2014 to the present, as amended, were not appropriate because they were not reasonably calculated to confer a meaningful educational benefit based on her needs.

C.  Placement at the Curtis Blake Day School was Appropriate for Lauren and Parents are Therefore Entitled to Reimbursement for the Cost of that Placement

Having met their burden to prove that the District did not offer FAPE to Lauren at the time of their unilateral placement, Parents will be entitled to reimbursement for that placement if they can establish that Curtis Blake was appropriate for Lauren. As detailed above in Findings 26-32, Curtis Blake provided Lauren with a substantially separate language-based program delivered by skilled professionals. Curtis Blake may have been too restrictive a placement for Lauren in that it did not provide any opportunities for mainstreaming with her typically-developing peers,[82] parents who make unilateral placements owing to an IEP deemed by a

---

[79] *Pachl v. Seagren*, 453 F.3d at 1068 (internal citation omitted).

[80] December 16, 2014 was the date of the last IEP presented to Lauren's parents before they removed her from the District.

[81] See *Roland M. v. Concord Sch. Comm.*, 910 F.2d at 992.

[82] Moreover, as detailed in notes 49-50 and accompanying text, *supra*, Ms. Lafontaine's testimony as to Lauren's reading level was inconsistent.

Hearing Officer to be inappropriate are not bound by the same legal obligations that govern school districts.[83] I find that Curtis Blake was appropriate for Lauren during the 2014-2015 school year. Parents are therefore entitled to reimbursement by the District for their unilateral placement.

D.   The District's Proposed "Focus" Classroom May Be An Appropriate Placement for Lauren for the 2015-2016 School Year

As the Focus Program was still in its formative stages at the time of the hearing in this matter and no IEP had been developed placing Lauren in the program, it would be premature for me to find that the Focus Program is appropriate to meet Lauren's needs. However, should the Focus Program materialize as described by Ms. Henrich, in the form of a substantially separate,[84] language-based program with appropriate peers that incorporates Lindamood Bell and other evidence based reading strategies across the curriculum, with opportunities for inclusion and flexibility based on students' needs, it would be appropriate for Lauren.


**ORDER**

Hampden-Wilbraham Regional School District is hereby directed to reimburse Lauren's Parents for tuition and costs associated with her enrollment at Curtis Blake Day School from January to June 2015.

Hampden-Wilbraham Regional School District is further directed to locate or create a substantially separate language-based program for Lauren, with opportunities for inclusion. Its Focus Program may well be appropriate.


By the Hearing Officer:

_____

Amy M. Reichbach
Dated: August 19, 2015


---

[83] See *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12-13 (1993).

[84] Dr. Tobias testified that the Focus Program would run whether or not a minimum of three students enrolled in it as a substantially separate language-based program, and suggested that students with partial inclusion IEPs might receive services in the Focus classroom even if they were not placed in the program officially. To the extent this occurs, the Focus Program might not actually serve its purpose.

31

Hearing Officer to be inappropriate are not bound by the same legal obligations that govern school districts.[83] I find that Curtis Blake was appropriate for Lauren during the 2014-2015 school year. Parents are therefore entitled to reimbursement by the District for their unilateral placement.

D.   The District's Proposed "Focus" Classroom May Be An Appropriate Placement for Lauren for the 2015-2016 School Year

As the Focus Program was still in its formative stages at the time of the hearing in this matter and no IEP had been developed placing Lauren in the program, it would be premature for me to find that the Focus Program is appropriate to meet Lauren's needs. However, should the Focus Program materialize as described by Ms. Henrich, in the form of a substantially separate,[84] language-based program with appropriate peers that incorporates Lindamood Bell and other evidence based reading strategies across the curriculum, with opportunities for inclusion and flexibility based on students' needs, it would be appropriate for Lauren.

## ORDER

Hampden-Wilbraham Regional School District is hereby directed to reimburse Lauren's Parents for tuition and costs associated with her enrollment at Curtis Blake Day School from January to June 2015.

Hampden-Wilbraham Regional School District is further directed to locate or create a substantially separate language-based program for Lauren, with opportunities for inclusion. Its Focus Program may well be appropriate.

By the Hearing Officer:

*Amy M. Reichbach*
Amy M. Reichbach
Dated: August 19, 2015

---

[83] See *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12-13 (1993).
[84] Dr. Tobias testified that the Focus Program would run whether or not a minimum of three students enrolled in it as a substantially separate language-based program, and suggested that students with partial inclusion IEPs might receive services in the Focus classroom even if they were not placed in the program officially. To the extent this occurs, the Focus Program might not actually serve its purpose.

# COMMONWEALTH OF MASSACHUSETTS
# BUREAU OF SPECIAL EDUCATION APPEALS

## EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must obtain such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

**Rights of Appeal**

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

An appeal of a Bureau decision to state superior court or to federal district court must be filed within ninety (90) days from the date of the decision. 20 U.S.C. s. 1415(i)(2)(B).

**Confidentiality**

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

**Record of the Hearing**

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.